UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**STEVEN YEAPLE**,                                    Case No. 6:16-cv-00034-KI

            Plaintiff,

                                                OPINION AND ORDER

                    v.

**NANCY A. BERRYHILL**, Acting
Commissioner of Social Security,[1]

            Defendant.


        Tim Wilborn, Attorney at Law
        Wilborn Law Office, P.C.
        P.O. Box 370578
        Las Vegas, NV 89137

                Attorney for Plaintiff

        Billy J. Williams
        United States Attorney
        District of Oregon
        Janice E. Hebert

---

        [1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit.

Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902

Erin Highland
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

     Attorneys for Defendant

KING, Judge:

Plaintiff Steven Yeaple brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I reverse the decision of the Commissioner and remand for further proceedings.

## BACKGROUND

Yeaple filed applications for SSI and DIB on June 11, 2012, alleging a disability onset date of June 5, 2008. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Yeaple, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on May 19, 2014.

On July 16, 2014, the ALJ issued a decision finding Yeaple not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on November 10, 2015.

PAGE 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified degenerative disc disease and degenerative joint disease of the cervical spine, left shoulder impingement, neuropathy secondary to type II diabetes mellitus, and anxiety disorder as Yeaple's severe impairments. The ALJ found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded Yeaple retained the residual functional capacity ("RFC") to perform medium work. Yeaple can lift and carry 50 pounds occasionally and 25 pounds frequently, can sit for 6 hours during an eight-hour workday, and can stand/walk for six hours during an eight-hour workday. Yeaple, however, can have only occasional public and face-to-face coworker contact, and he cannot work around crowds or work in a small room (office-sized room or smaller) without windows.

Given this RFC, Yeaple could not perform his past relevant work. Instead, the ALJ concluded Yeaple could perform jobs in the national economy such as budder, hand packager, and laundry worker. As a result, the ALJ found Yeaple not disabled under the meaning of the Act.

## FACTS

Yeaple was 52 years old on his alleged disability onset date. He has an eighth grade education. He worked as a recreational vehicle repairer until he was laid off in June 2008. In

explaining why his employment came to an end, Yeaple variously explained, "[E]mployers do not like the problems that I am experiencing and therefore I have been laid off," that "it is hard to find work at my age with my problems," that he had to take breaks because of his diabetes and the owner "felt that [he] was dispensable," and that he was "laid off from his last job when the company went out of business." Tr. 241, 378, 435. Yeaple also reported he "has not been able to find work." Tr. 422.

Yeaple has been evaluated for mental and neurological issues. In October 2008, Michelle Whitehead, MHNP, PhD, diagnosed Yeaple with anxiety disorder, NOS. She noted Yeaple's immediate recall was in the "borderline" range, and his overall functioning was low average. Yeaple explained to Dr. Whitehead that he had worked as an RV technician for 15 years. He worked for the last company for five years. Yeaple's "manager quit and he had to deal with . . . the owner. [Yeaple] reports that the owner had ADHD and was difficult to deal with. [Yeaple] reports that [the owner] was hypersensitive about [Yeaple's] diabetes. He was laid off about five months ago. [Yeaple] notes that [the owner] recently committed suicide." Tr. 368. Additionally, Yeaple explained to Dr. Whitehead that he cannot lift heavy loads due to a previous back injury, and that "no one is hiring due to the downturn in the economy. He is receiving unemployment benefits." *Id.* Yeaple spent his days working around his friend's property or helping with his church's construction project. He handed out cards for doing RV repair and generally had one repair a month. He "mainly works to keep busy." Tr. 370. He enjoyed hot rod cars and went to car shows. He enjoyed model railroading. Dr. Whitehead commented that Yeaple is "now having difficulty finding a new job in the industry he has worked in for many

years.  He reports trying to do RV repair jobs from individuals he knows or is referred to."  Tr. 371.

A few months later, Gary Buchholz, MD, examined Yeaple.  He diagnosed Yeaple with Type II diabetes mellitus, controlled with naturopathic medications.  Yeaple told Dr. Buchholz he had injured his shoulder in 1984 and had surgery on it in 1998; Yeaple thought he could only lift 30 to 40 pounds, but he felt his range of motion was fine.  On examination, Dr. Buchholz noted "normal power and facility of movement" and "[n]o neurologic evidence of ongoing difficulty in the shoulder."  Tr. 378.  Yeaple explained that in his last job, "his regular boss quit and the owner took over and felt that Mr. Yeaple was dispensable" so he was laid off.  Tr. 378.  Yeaple commented that he often had to take breaks and drink water or eat food for his diabetes.  Yeaple did not display any memory difficulties, although Yeaple complained of memory loss.  Dr. Buchholz found no restrictions in standing, walking, or sitting and that Yeaple had been working "quite satisfactorily" until he was laid off "and it is not clear that he has deteriorated since that time."  Tr. 379.  Dr. Buchholz noted that if Yeaple really had a permanent lifting restriction of 30 pounds, it should be honored, but he noted Yeaple "seems well muscled and it's not clear that he would have a specific restriction."  *Id.*

Yeaple was treated in urgent care in 2010 for symptoms he experienced as a result of water intoxication.  Yeaple reported "loading and unloading a lot of building materials lately.  He says he drinks gallons of water a day."  Tr. 408.

Yeaple established care with Dawna-Marie Fixott, M.D., for treatment of his diabetes, blood pressure and cholesterol in August 2010.  She started Yeaple on Actos for his diabetes.

Dr. Fixott noted Yeaple's diabetes and hypertension were in "excellent control" when she saw him in September.  In January 2011, Yeaple reported having stopped taking Actos; the doctor described Yeaple as a "type 2 diabetic who takes cinnamon and gets a great deal of exercise."  Tr. 477.  After discussing options, Yeaple decided to go back to taking Actos.

Yeaple went to the emergency room in February 2011 for vomiting and elevated blood pressure.  He was given an anti-nausea medication and sent home.  Tr. 476.

David Herrin, D.C., began providing chiropractic and massage therapy in March 2011 upon Yeaple's reports of moderate low and upper back pain, as well as pain in his neck.  He "lifted too much weight and turned the wrong way, lifting wood."  Tr. 514.

Yeaple reported to Dr. Fixott in April 2011 that he was experiencing incontinence at night; Dr. Fixott severely limited his water intake.  Tr. 474.  In May 2011, Yeaple returned to Dr. Fixott and his labs were good.

Yeaple saw Dr. Herrin in May and October 2011 for treatments; in October, he reported lifting wood again.

Dr. Fixott followed up with Yeaple's diabetes in February 2012.  His diabetes was controlled on Actos and cinnamon.  He also discussed his blood pressure and high cholesterol.  Tr. 469.

The same month, Yeaple told Dr. Herrin that he felt an increase in the severity of pain in his upper back, but that he felt better after treatment for quite some time until it flared again.  Yeaple returned to Dr. Herrin in May and July 2012 for adjustments.

The possibility of autism spectrum disorder arose in August 2012 and Yeaple was evaluated by Debra Eisert, PhD.  She diagnosed social phobia with features of Asperger

syndrome.  She noted Yeaple "is reportedly quite good mechanically, but has not been able to

find work."  Tr. 422.  He had one friend and he enjoyed helping her out with chores on the

property.  Dr. Eisert advised Yeaple to contact social security to see if he was eligible for

services.

Yeaple continued to see Dr. Herrin for treatments.  In August, Yeaple's pain in the back

had worsened, but his neck was better.

At the request of the agency, Mike Henderson, D.O., examined Yeaple in October 2012.

He diagnosed Yeaple with diabetic neuropathy with mild neuropathy in the feet.  Despite a left

shoulder injury, Yeaple had intact range of motion with a positive impingement sign on the left

side and some atrophy of the left deltoid.  Dr. Henderson thought Yeaple would be limited in his

ability frequently to work above shoulder height.  There was no evidence of sitting, standing or

walking limitations, although Yeaple should be restricted from working conditions that may

cause trauma to the feet.  Dr. Henderson noted Yeaple could feel pressure in his feet, but had

difficulty detecting sharpness and temperature.  Nevertheless, Yeaple should be able to go up and

down ladders and work from unprotected heights.  He should rarely reach above shoulder height

and he was limited to lifting 75 pounds occasionally.  Tr. 427.

In December 2012, Yeaple told Dr. Herrin that he suffered "a severe new complaint of

frequent pain in the left shoulder, with some on the right shoulder as well."  Tr. 519.  Yeaple had

felt pain after lifting.  Three days later, Yeaple reported a "marked degree [of] improvement

noted in the left shoulder pain.  He is able to move it much better."  Tr. 519.  He reported

improvement in thoracic, neck and lumbar pain, as well.

In January and February 2013, however, Yeaple told Dr. Herrin that his shoulder pain had been slightly more severe, along with neck and back pain.

Dr. Fixott noted Yeaple's diabetes was well-controlled in February.  Yeaple reported having fallen two days before while carrying a load of wood in his left arm.  Hot showers and cold packs were helping the pain in his arm.  His shoulder was warm compared to the right, and his range of motion was limited.  Dr. Fixott recommended warm showers, and gave him a prescription for meloxicam and Tylenol 3.  Tr. 433.

Dr. Whitehead re-examined Yeaple that same month and thought his current symptoms were more consistent with a social phobia, rather than anxiety.  Yeaple reported not being successful finding work in the past five years.  Tr. 434.  He reported no longer being able to lift heavy loads.  He displayed normal gait and station, and a stiff left arm.  Dr. Whitehead commented that Yeaple "views himself as having multiple medical problems that prevent him from working.  His presentation of symptoms appears to be beyond what a recent IME has found."  Tr. 437.

Yeaple returned to Dr. Herrin in April 2013.  Yeaple reported pain in his shoulder and that he could hardly lift.  He had been lifting wood and felt pain afterward.  Dr. Herrin diagnosed tendonitis of the shoulders and muscle spasms.  Yeaple displayed decreased range of motion in the shoulders with painful muscle testing.

Yeaple went to the emergency room in June 2013 with tremors, anxiety, and numbness on the top of his head.  He had been working outside and drinking up to 2 gallons of water.  He was treated for water toxicity.

PAGE 10 - OPINION AND ORDER

Yeaple returned to Dr. Fixott In July. He explained that he had been in the hospital after drinking too much water. He had been working in the hot sun. Yeaple also asked Dr. Fixott to complete disability paperwork, which she declined to do. She noted that she was not aware he had been diagnosed with anything that would qualify him for social security, although he reported anger management, anxiety, and shoulder pain when lifting anything over 50 pounds. Tr. 561.

Yeaple began counseling with Dan Sheahan, MA, at the end of July 2013, who diagnosed panic disorder and agoraphobia.

Yeaple was in a car accident in September 2013 and returned to Dr. Herrin for treatment. He thought his shoulder pain was about the same. His muscle strength tested normal, except for left bicep testing was 3/5 due to prior/chronic shoulder pain. Dr. Herrin treated Yeaple nine times in September with adjustments and muscle massage. X-rays revealed mild degenerative disc disease at C6-7 and C7-T1 and foraminal stenosis at C4-5 and C6-7 on the left.

Dr. Herrin completed a function report for Yeaple in September 2013, after he learned of Yeaple's car accident. In it, Dr. Herrin opined that Yeaple's pain would constantly affect his attention and concentration, that he could sit for one hour before needing to stand and walk around, and that he could only sit for a total of four hours. Dr. Herrin opined that Yeaple would have to elevate both legs to minimize pain, and that he could stand or walk for one hour at a time for four hours total, and then he would need to lie down. Yeaple could never lift over ten pounds. He could occasionally reach with either hand.

Dr. Herrin treated Yeaple six times in October, six times in November, and six times in December 2013, four times in January 2014, three times in February, and twice in March 2014.

Over the course of these treatments, Dr. Herrin noted that Yeaple showed some reduction in symptoms and responded adequately to treatment.  In November, Yeaple reported more pain and tension after lifting and hauling wood over the weekend. He tried to keep his loads light but he felt increased symptoms afterward.  Similarly, he reported feeling stiff in December after moving firewood.  He continued to have lower back pain, reporting he had been lifting wood every day. Dr. Herrin suggested using ice after moving wood.  Yeaple felt "pretty good" in February 2014. Tr. 608.  By March 2014, Yeaple reported general improvement in cervical pain, less intense pain in the head, upper back pain not as bad lately, and significant improvement in the lower back.

Mary Skzrynski, M.D., examined Yeaple in April 2014.  She identified muscle wasting in the entire left shoulder girdle and commented that he "clearly has dysfunction of the left shoulder."  Tr. 615.  Additionally, "[e]xamination of the low back reveals marked guarding and stiffness and what I believe to be a very poor effort on attempted double inclinometer range of motion testing, so validity is questionable."  Tr. 616.  She diagnosed cervical strain/sprain related to the car accident, but his "long list of musculoskeletal complaints" were not caused by the accident.

**DISCUSSION**

Yeaple challenges the ALJ's decision on the following grounds:  (1) the ALJ failed to give clear and convincing reasons to question Yeaple's reports about his symptoms; (2) the ALJ improperly rejected Dr. Henderson's opinion; (3) the ALJ improperly rejected Dr. Herrin's opinion; and (4) the ALJ failed to give germane reasons for his rejection of the lay witness observations.

I.      Yeaple's Symptom Testimony

Yeaple testified that after he injured his neck and back at work, he found his neck was always stiff and sore.  He mentioned that his shoulder's condition had deteriorated following surgery, and that if he tried to lift anything more than 10 or 12 pounds repetitively his shoulder hurt.  In his various function reports, Yeaple reported dizzy spells, needing to use the bathroom frequently, and an inability to lift more than 20 to 25 pounds repetitively with his left arm.  He mowed the lawn with a tractor, he shopped once a week with someone accompanying him, he enjoyed model railroads and going for long drives, and he went to church weekly.  Yeaple thought he could walk for ½ mile before needing to stop and rest.  He prepared his own meals three times a day and he could perform household chores.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  *Id.*  "[U]nless an ALJ makes a finding of malingering based

PAGE 13 - OPINION AND ORDER

on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[2]

The ALJ commented that Yeaple's statements were not entirely credible for the following reasons:  (1) they were unsupported by the medical record; (2) he engaged in greater activity level than "the level alleged by his efforts to receive disability benefits[;]" (3) Yeaple's job ended for reasons other than his disability; (4) and Yeaple's "focus on disability, rather than objective medical findings, leads to contrary descriptions of the claimant's actual abilities."  Tr. 23. Although Yeaple complains the ALJ's analysis is too general and fails to offer sufficiently concrete examples to support his reasoning, I find that the ALJ's analysis is sufficiently clear and specific so as to facilitate my review of the record in ensuring the ALJ did not arbitrarily reject Yeaple's testimony.  *See Bunnell v. Sullivan*, 947 F.2d 341, 345-47 (9th Cir. 1991).

As Yeaple correctly asserts, the ALJ's statement about Yeaple's activity level being "greater than the level alleged by his efforts to receive disability benefits" is nonsensical.  Tr. 23. It is true that daily activities might contradict a claim of debilitating impairment (if that is what the ALJ meant), but the ALJ here failed to articulate any inconsistency between Yeaple's testimony and his stated activities.  The other possible rationale daily activities may be relevant would be to show Yeaple could perform medium work, but the Commissioner concedes the ALJ

_____

[2]The Commissioner urges the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence.  Def.'s Br. 4, n.2.  The Ninth Circuit has rejected her argument.  *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

did not rely on these activities for that reason.[3]  Further exploration of Yeaple's activities,

however, may very well demonstrate both inconsistency with testimony and capacity to perform

medium work.  *See* Tr. 408 (loading and unloading a lot of building materials lately), 477 (gets a

great deal of exercise), 514 (lifting wood), 422 (chores on property).

The ALJ could properly rely on the fact that Yeaple's job ended because he was laid off.

While there is some suggestion in the record that Yeaple's most recent employer did not like that

Yeaple had diabetes, and may have considered Yeaple's condition when deciding who to lay off,

the record could also support the ALJ's conclusion that Yeaple himself did not stop working

because he could no longer perform the work.  Tr. 378, 435.  The specific evidence the ALJ cited

in support of his reasoning, however, is not substantial enough to support his conclusion.  He

relied solely on Dr. Whitehead's report, which suggests Yeaple was laid off because of his

diabetes–one of Yeaple's impairments.

The ALJ's statement that Yeaple's "focus on disability, rather than objective medical

findings," as "lead[ing] to contrary descriptions of the claimant's actual abilities" is, again,

nonsensical.  Tr. 23.  It appears the ALJ attempted to point out inconsistencies in Yeaple's

presentation and statements, and his questionable effort on tests.  Lack of cooperation during an

evaluation and efforts to impede accurate testing of limitations are valid reasons to find that a

claimant lacks credibility, *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), as is a

tendency to exaggerate symptoms.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  It

is possible the ALJ could read the medical reports of Dr. Whitehead, Dr. Henderson, Dr.

---

[3]It appears both parties agree Yeaple would be deemed disabled even if he could perform
the full range of sedentary and light exertion work based on the medical-vocational rules.  *See* 20
C.F.R. Pt. 404, Subpt. P, App. 2, Rules 201.02, 201.10, and 202.02.

Skrzynski, and Dr. Fixott and find support for such reasoning.  Since I am reversing and

remanding for further hearing, the ALJ may reconsider the value of the observations made by

Yeaple's treating and examining physicians.

That leaves only the ALJ's reliance on lack of corroborating medical evidence to support

his credibility analysis.  The ALJ, however, cannot reject subjective pain testimony solely

because it was not fully corroborated by objective medical evidence.  *Rollins v. Massanari*, 261

F.3d 853, 857 (9th Cir. 2001).

In sum, the ALJ failed to provide sufficient clear and convincing reasons to support his

credibility determination.

II.    Medical Evidence

Yeaple charges the ALJ with failing to give reasons for rejecting portions of Dr.

Henderson's opinion, and erring in his rejection of Dr. Herrin's opinion.

A.    Dr. Henderson

The ALJ accepted Dr. Henderson's opinion–giving "significant weight" to his

conclusions.  The ALJ failed, however, to ask the vocational expert ("VE") whether Dr.

Henderson's upper left extremity reaching restriction, and requirement that Yeaple avoid jobs

that could cause trauma to his feet, could be accommodated by the jobs the VE identified.

Indeed, Yeaple points out that all of the jobs the VE named require reaching in excess of

occasional.  DOT #405.684-010 (budder requires constant reaching); DOT #920.587-018 (hand

packager requires constant reaching); DOT #361.684-014 (laundry worker requires frequent

reaching).

The Commissioner concedes that the ALJ neglected to include these restrictions in the RFC, but insists the error is harmless because the DOT does not indicate that both arms are required for the reaching task.  Yeaple's limitation on reaching is restricted to his left side only.

Yeaple points out that the Commissioner's argument misses the mark.  Since the ALJ neglected to ask the VE about Yeaple's lifting limitation, there is no evidence at all supporting the ALJ's finding that Yeaple can perform the jobs the VE identified.  The burden is on the Commissioner to prove there are other jobs Yeaple can perform in the national economy.  Hypothetical questions posed to a vocational expert must specify all of the limitations and restrictions of the claimant.  *Edlund v. Massanari*, 253 F.3d 1152, 1160 (9th Cir. 2001).  If the hypothetical does not contain all of the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.  *Id.*  Remand is necessary for additional testimony from the VE to clarify the issue.

Since I find a remand is necessary to resolve the issue of Yeaple's reaching limitation, I also direct the ALJ to address Dr. Henderson's comment about the need for Yeaple to avoid working conditions that could cause trauma to the feet.  Dr. Henderson's statement appears ambiguous to me–and appears to be directed at dangerous working conditions where he would have "difficulty detecting sharpness" or difficulty sensing temperature.  Tr. 427.  The ALJ should address the ambiguity and take evidence from a VE to determine whether Yeaple can perform other work in the national economy.

B.    Dr. Herrin

The ALJ found Dr. Herrin's opinion about Yeaple's weight lifting limitation was not supported by objective medical findings.  He also noted Dr. Herrin "is not an acceptable medical

source" and gave his opinion little weight for that reason as well. The ALJ rejected Dr. Herrin's

opinion as to Yeaple's anxiety and Asperger's syndrome, when Dr. Herrin had no expertise to

give an opinion on such diagnoses. Additionally, the ALJ criticized Dr. Herrin for failing to

support his statements that Yeaple's pain would interfere with his attention and concentration,

and ability to deal with work stress. The ALJ noted that Dr. Herrin's opinion about Yeaple's

need to elevate his legs was unsupported by any other medical source. Finally, the ALJ

commented that Dr. Herrin's opinion was "overly sympathetic to the claimant's efforts to receive

disability benefits" and "inconsistent with the opinions of more qualified medical physicians and

psychologists." Tr. 26.

Dr. Herrin is not considered an acceptable medical source, but this is not a sufficient

reason to reject his opinion with respect to the severity of Yeaple's impairments. 20 C.F.R. §§

404.1513(d) and 416.913(d) (other sources may be considered when evaluating severity of

impairments). Instead, in considering the opinions of other medical sources, the ALJ should

consider: (1) how long the source has known the claimant and how frequently the source has

seen the claimant; (2) whether the opinion is consistent with other evidence; (3) the degree to

which the source presents relevant evidence supporting an opinion; (4) how well the source

explains the opinion; and (5) whether the source has a specialty or area of expertise related to the

claimant's impairments. SSR 06-03p, *available at* 2006 WL 2329939 (Aug. 9, 2006). The ALJ

may reject the opinions of such sources by giving reasons that are "germane" to that source.

*Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

The ALJ neglected to address Dr. Herrin's opinions about Yeaple's sitting, standing and

walking limitations. Additionally, his reason for rejecting Dr. Herrin's opinion about Yeaple's

PAGE 18 - OPINION AND ORDER

weight lifting limitation is not a germane reason as Dr. Herrin made multiple objective findings

as to Yeaple's shoulder in his chart notes, although notably not until December 2012. Tr. 519

(describing "new complaint of frequent pain in left shoulder"). Further, there is no support in the

record for the ALJ's conclusion that Dr. Herrin was "overly sympathetic" to Yeaple's disability

claim, and inconsistency with medical physicians is not a germane reason to reject the opinion of

Yeaple's chiropractor even though he is not an "acceptable medical source" under the regulations

when he is the only one who evaluated the effect of Yeaple's cervical spine impairment. SSR

06-03p.

Nevertheless, there are ample reasons to question Dr. Herrin's opinion, making remand

for rehearing appropriate. For example, Dr. Herrin's chart notes arguably do not support his

opinions about Yeaple's walking, standing and sitting limitations, and Yeaple reported "new"

shoulder pain in December 2012. As the Commissioner points out, Dr. Herrin encouraged

walking and did not tell Yeaple to reduce his activity. Additionally, the fact that Dr. Herrin

commented on Yeaple's mental health impairments, and identified limitations such as the need to

elevate legs, arguably puts the remainder of Dr. Herrin's opinion of Yeaple's positional and

lifting limitations into question. Finally, Dr. Herrin completed the form right after Yeaple's car

accident, when Yeaple improved over the course of the following few months.

The ALJ should reassess Dr. Herrin's opinion.

III.    Lay Testimony

Yeaple's wife offered her opinion that Yeaple could not lift over 20 pounds, was easily

confused, and could not focus. She thought he could not deal with people, that he heard things

that were not there, that he was forgetful, and regularly dropped items from his hands. Yeaple

complains that the ALJ addressed only the conflict between Williams-Yeaple's reports about his nonexertional limitations and neglected to give a germane reason to reject her opinion about Yeaple's exertional limitations.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006).

The Commissioner does not address Yeaple's argument that the ALJ failed to give germane reasons to reject Williams-Yeaple's opinion about Yeaple's exertional limitations, and the reasons the ALJ gave for rejecting the nonexertional limitations are not equally applicable to the exertional limitations. *See, e.g. Dale v. Colvin*, 823 F.3d 941, 944-45 (9th Cir. 2016) (discussing how "germane" reasons may apply to the entirety of a witness' testimony). The ALJ commented that Yeaple's "activity level has a greater consistency with an ability to perform work, rather than indicating an inability to work," but the examples he provided–preparing food, loading the dishwasher, mowing the lawn using a riding mower, shopping, engaging in hobbies, and attending church–are not inconsistent with Williams-Yeaple's opinion that Yeaple could only lift 20 pounds and that he dropped things. Tr. 26. It is error to discredit a lay witness' entire testimony on the basis of reasoning which applies to only a portion of the report. *Dale*, 823 F.3d at 946.

Nevertheless, there are reasons that an ALJ could give. For example, Williams-Yeaple's opinion about Yeaple's weight limitation is contradicted by statements Yeaple himself made. Tr. 378 (claims to have 30 pound weight restriction), 561 (told Dr. Fixott he could not lift over 50 pounds).

IV.    Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits.  *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited.  *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).  Alternatively, the court can remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."  *Id.* at 1021.

This is not the rare case warranting a remand for a finding of disability.  Based on the errors described above, remand for further proceedings to reassess Yeaple's testimony, the medical evidence, and the lay witness statement is appropriate.

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above.  Judgment will be entered.

Dated this  30th  day of March, 2017.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge